Filed 5/31/22  In re I.H. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.H. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078454 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J282885; J282886) |
| v. | OPINION |
| G.H., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Reversed and remanded with directions.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Dawn M. Martin, Deputy County Counsel, for Plaintiff and Respondent.

1

G.H. (father) appeals from orders terminating his parental rights to his daughters E.H. and I.H. (collectively children). The mother of the children claimed to have Cherokee, Blackfoot, and/or Sioux ancestry. Pursuant to the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related federal and state law, Children and Family Services (CFS)[1] sent notice of the proceedings to all such tribes; none of them responded that the children were members or eligible to become members.

After that notice was sent, the father and his mother claimed to be descended from Pocahontas. The father now contends that CFS failed to adequately investigate that claim and failed to give notice to any Pocahontas-related tribe.

We will hold that CFS erred by failing to make any ICWA inquiry to the father's father. However, we will also hold that, based on the inquiries that it did make, CFS had no duty to give notice to any to any Pocahontas-related tribe. Accordingly, we will reverse, but only conditionally; if the father's father provides no information rising to the level of reason to believe that the children are Indian children, the juvenile court must reinstate the order terminating parental rights.

---

**1** This case was initially filed in Los Angeles County, then transferred to San Bernardino County. We will use "CFS" to refer to the social services agency that was responsible for the case at the relevant time, whether it was the Los Angeles County Department of Children and Family Services or San Bernardino County Children and Family Services.

I

STATEMENT OF THE CASE

The father and J.M. (mother) lived together for four years.  They have two daughters together, E.H. and I.H. (collectively children).  Both children tested positive for marijuana at birth.

In November 2018, the father slapped and punched the mother, knocking her down.  He then left with the children and did not return.

In December 2018, the mother called police and reported that the father had raped her.  The father maintained that the alleged rape was consensual sex.[2]

Each parent accused the other of previous domestic violence.  The father said that the mother had been diagnosed with multiple mental illnesses but refused to take her medication.

Accordingly, in February 2019 — when E.H. was seventeen months old and I.H. was four months old  — CFS filed a dependency petition regarding them.  At that point, the father was incarcerated.  He was released in April 2019.

Initially, the children were left in the mother's care, with family maintenance services.  The mother, however, repeatedly left or was asked to leave her housing situations, because she was noncompliant, abrasive, and/or confrontational.  She did not drug test regularly as required.

---

[2]     He was never charged with rape.

3

In April 2019, in violation of a restraining order, the mother took the children to see the father; she also tried to contact him on Facebook. Because she had made remarks about leaving the state, CFS believed she was "a flight risk."

For these reasons, in April 2019, CFS removed the children from the mother's custody and placed them in a foster home.

In May 2019, at the jurisdictional hearing, both parents pleaded no contest. The juvenile court found jurisdiction based on a risk of serious physical harm and failure to protect. (Welf. & Inst. Code, § 300, subds. (a), (b).)[3]

In June 2019, the father was arrested; he served a prison term.

In October 2019, at the dispositional hearing, the juvenile court formally removed the children from the parents' custody. It ordered reunification services for both parents.

In October 2020, the father was arrested again. He remained in custody throughout the rest of the case.

In June 2021, at the 18-month review hearing, the juvenile court terminated reunification services and set a section 366.26 hearing.

In February 2022, at the section 366.26 hearing, the juvenile court found that the children were adoptable and that there was no applicable exception to termination. Accordingly, it terminated parental rights.

---

[3] All further statutory references are to the Welfare and Institutions Code unless specified.

## II

## STATEMENT OF FACTS

In February 2019, the mother claimed to have Cherokee, Blackfoot, and/or Sioux ancestry. She said the father also had Indian ancestry. The juvenile court ordered CFS to investigate the father's Indian ancestry.

The father told a social worker that he did not have any Indian ancestry. The father's mother (Margaret) likewise told a social worker that the father had no Indian ancestry on either side. There is no indication that any social worker ever asked the father's father (Wesley) about the father's Indian ancestry.

In March 2019, CFS sent an ICWA notice (March notice) to 24 Cherokee, Blackfoot, and Sioux tribes and to the Bureau of Indian Affairs. As to the father, the March notice included:

(1) The father's name, address, date of birth, and place of birth.

(2) Margaret's name, address, date of birth, and place of birth.

(3) Wesley's name and date of birth; all other information about him and his parents was listed as either "unknown" or "[the paternal grandmother] did not have this information."

(4) Margaret's mother's name, date of birth, date of death, and place of death.

(5) Margaret's father's name, partial date of birth, and place of birth.

The March notice indicated that the mother had Indian ancestry, but the father did not (e.g., as to his "[t]ribe," it stated, "Does not apply").

5

None of the tribes that responded claimed the children as members or as eligible for membership.

Meanwhile, in April 2019, at his first court appearance, the father contradicted his earlier denial and claimed that he did have Indian ancestry; his grandmother had told him that he "was related to Pocahontas." Margaret then also contradicted her earlier denial and said that the father was related to Pocahontas's tribe through her mother, Virginia. The juvenile court ordered CFS to continue to investigate the father's Indian ancestry.

The social worker determined that Pocahontas's tribe would be the "Pumankey Tribe."[4] According to the social worker, in May 2019, an ICWA notice (May notice) was sent to the "Pumankey Indian Tribe" (as well as to 14 of the tribes that had already been given notice). However, a copy of the notice and proof of mailing were not attached. Moreover, the social worker never reported back on whether CFS had received return receipts or whether any of these tribes had responded.

In July 2019, the juvenile court found that ICWA did not apply.[5]

---

[4]     This would be the Pamunkey Indian Tribe (Pamunkey Tribe). (See Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs (2019) 84 Fed. Reg. 1200-01.)

[5]     The record suggests a reason why the juvenile court did not wait to learn the results of the May notice.

One of the tribes that received the March notice had initially responded that the children *were* members of the tribe. As a result, the juvenile court found that ICWA applied and transferred the case to a different judge, who handled all of the court's ICWA cases. That tribe then said it had made a mistake and the children were *not* members.

6

III

ICWA ISSUES

A.    *Applicable Legal Principles*.

Under ICWA and related federal and state law, an "Indian child" is defined as a child who is either (1) a member of a federally recognized Indian tribe, or (2) both the biological child of a member of a federally recognized tribe and eligible for membership in the tribe.  (*In re J.S.* (2021) 62 Cal.App.5th 678, 689; accord, 25 U.S.C. § 1903(4), (8); 25 C.F.R. § 23.2; Welf. & Inst. Code, § 224.1, subds. (a), (b).)

"The court [and the] county welfare department . . . have an affirmative and continuing duty to inquire whether a child for whom a petition . . . has been filed[] is or may be an Indian child."  (§ 224.2, subd. (a).)  "'This continuing duty can be divided into three phases:  the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.'  [Citation.]"  (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 402.)

Initially, the social services agency must "ask[] the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child

---

The new judge — presumably unaware of the May notice — therefore found that ICWA did not apply.

The parties should have alerted the new judge that the May notice was outstanding, but it seems likely that they simply forgot.  However, this does not excuse the social worker who failed to file either the May notice or the responses to it.

. . . ." (§ 224.2, subd. (b); see also *id*., subd. (a).)  Also, "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child."  (*Id*., subd. (c).)

Next, "[i]f the court [or] social worker . . . has *reason to believe* that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the court [or] social worker . . . shall make further inquiry regarding the possible Indian status of the child . . . ." (§ 224.2, subd. (e), italics added.)  There is "reason to believe" "whenever the court [or] social worker . . . has . . . information that indicates, but does not establish," that the child is an Indian child.  (*Id*., subd. (e)(1).)

"[T]he requisite 'further inquiry' 'includes: (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe.' [Citation.]"  (*In re Austin J.* (2020) 47 Cal.App.5th 870, 883; see also § 224.2, subd. (e)(2).)

Finally, in a dependency that could result in a foster care placement or termination of parental rights, if "[t]here is *reason to know* a child involved in a proceeding is an Indian child," notice of the proceeding must be given to the relevant tribe or tribes. (25 U.S.C. § 1912(a); 25 C.F.R. §§ 23.11(a), 23.111; Welf. & Inst. Code, § 224.3, subd. (a); Cal. Rules of Court, rule 5.481(c)(1), all with italics added.)  "Proof of the notice,

including copies of notices sent and all return receipts and responses received, shall be filed with the court . . . ." (§ 224.3, subd. (c); see also 25 C.F.R. § 23.111(a)(2).)

There is "reason to know" under several specified circumstances. (§ 224.2, subd. (d); Cal. Rules of Court, rule 5.481(b)(1)(C).) The only one relevant here is if "[a]ny participant in the proceeding . . . informs the court that it has discovered information indicating that the child is an Indian child." (§ 224.2, subd. (d)(3); see also, subd. (d)(1).)[6]

"If the court makes a finding that proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings . . . ." (§ 224.2, subd. (i)(2).) A "court's finding that ICWA did not apply cannot stand without proof of proper notice." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 247; see also *In re Karla C.* (2003) 113 Cal.App.4th 166, 178-179.)

"In 2018, the Legislature enacted changes to the state's ICWA-related statutes . . . . [Citations.] The changes included a redefinition of the 'reason to know'

_____

[6]     There is also "reason to know" if:

"The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village" (§ 224.2, subd. (d)(2));

"The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child" (§ 224.2, subd. (d)(4));

"The court is informed that the child is or has been a ward of a tribal court" (§ 224.2, subd. (d)(5)); or

"The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d)(6).)

requirement that triggers the duty to give notice of the proceedings to Indian tribes. . . . [¶] This definition . . . replaced a definition under which the court would have a 'reason to know' that a 'child is an Indian child' based merely upon 'information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe.' [Citations.] Cases relying on such language are no longer controlling or persuasive on this point. [Citation.]" (*In re Austin J.*, *supra*, 47 Cal.App.5th at pp. 884-885.)

B. *Failure to Inquire*.

The father contends that CFS failed to carry out its duty of inquiry in two respects.

1. *Failure to contact Wesley*.

First, the father argues that CFS failed to contact his father, Wesley.

The March notice indicated that Wesley's birth date and birthplace were unknown, because "[the paternal grandmother] did not have this information." Evidently, then, social workers had not yet made any ICWA inquiry to Wesley.

On April 1 and again on April 11, 2019, a social worker spoke to Wesley on the phone. On April 18, 2019, a social worker visited his home to assess him for placement. On April 19, a social worker emailed him about the possibility of placement.

On April 23, 2019, the father claimed Indian ancestry for the first time. On April 29, 2019, Margaret confirmed that the father had Indian ancestry through her mother.

After that, however, as far as the record shows, CFS still did not make any inquiry to Wesley.

CFS "concedes that that there is no indication in the record that [it] asked Wesley about alleged Indian ancestry" and that "this could be seen as an error . . . ." It argues, however, that the error was harmless.

Ordinarily, a failure to comply with the duty of inquiry is deemed prejudicial. (E.g., *In re N.G.* (2018) 27 Cal.App.5th 474, 483.) This court has recognized one exception: when the parent asserting failure to inquire does not claim any Indian ancestry. (*In re A.C.* (2021) 65 Cal.App.5th 1060, 1069.) That is not the case here; the father is claiming Indian ancestry, albeit through Margaret rather than Wesley.

We have also recognized a second exception, at least in dictum: when it is "obvious that additional information would not have been meaningful to the inquiry." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 743.) Again, that is not the case here. Wesley may have had Indian ancestry that the father and Margaret were unaware of or forgot. Also, it is conceivable that Wesley may have known something about Margaret's Indian ancestry that she herself had forgotten.

Indeed, if CFS is so sure that Wesley has no useful information, we question why it has not simply contacted Wesley while this appeal was pending and asked him. If it did ask — and if he came up empty — it could file a declaration to that effect to show that this particular contention is moot. (*In re A.B.* (2008) 164 Cal.App.4th 832, 839-843.)

11

We therefore conclude that the failure to inquire of Wesley requires a conditional reversal.

### 2. *Failure to contact other tribes*.

Second, the father contends that CFS failed to contact any tribes, other than the Pamunkey Tribe, that are affiliated with Pocahontas. Unhelpfully, CFS does not respond to this contention.

The father says: "Pocahontas was the daughter of Powhatan and the descendants of the Powhatans are the Chickhominy, Eastern Chicahominy, Monacan, Nansemond, Pamunkey, Rappahannok, Mattaponi and Upper Mattaponi Tribes. (https://en.wikipedia.org/wiki/Pocahontas)"

We question whether we can take judicial notice of information from Wikipedia. (See Evid. Code, § 452, subd. (h) [court can take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy"]; *In re Marriage of LaMoure* (2011) 198 Cal.App.4th 807, 826 ["We do not consider Wikipedia a sufficiently reliable source."].)

In any event, that particular information is not in the Wikipedia article cited. The article merely says that Pocahontas "belong[ed] to the Powhatan people . . . ." (Wikipedia, Pocahontas <https://en.wikipedia.org/wiki/Pocahontas> [as of May 23,

12

2022], fn. omitted.)[7]  It also says, "In July 2015, the Pamunkey Native tribe became the first federally recognized tribe in the state of Virginia; they are descendants of the Powhatan chiefdom of which Pocahontas was a member." (*Ibid*., fn. omitted.)  As Pocahontas's father Powhatan (a/k/a Wahunsenacawh) presided over a confederacy of approximately 30 Algonquian-speaking groups (*ibid*.), a tribe descended from a member of the confederacy is not necessarily descended from Wahunsenacawh's own tribe.  And the identity of Pocahontas's mother is unknown.  (*Ibid*.)

In sum, we reject this contention because the father has not provided adequate factual support for it.

C.      *Failure to Give Notice*.

The father contends that CFS was required to give notice to the Pamunkey tribe but failed to do so.

As discussed, until 2018, a social services agency had a duty to give notice if there was "reason to believe" that the child is an Indian child.  (*In re B.H.* (2015) 241 Cal.App.4th 603, 606.)  This "set a low threshold to trigger the notice requirements of the federal law.  [Citations.]" (*In re Joseph P.* (2006) 140 Cal.App.4th 1524, 1529.)

---

[7]      We recognize that Wikipedia changes over time.  However, the same is true of the Pocahontas article as it stood when the father's brief was filed.  (Wikipedia, Pocahontas <https://en.wikipedia.org/w/index.php?title=Pocahontas&oldid=1079074661> [as of March 24, 2022].)

Currently, however, a social services agency has no such duty unless there is "reason to know" that the child is an Indian child. There is "reason to know," as relevant here, when someone claims to have "information indicating that the child is an Indian child." (§ 224.2, subd. (d)(3); see also *id*., subd. (d)(1).) And an Indian child must be, at a minimum, either a member of a federally recognized tribe or the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1903(4), (8).) The information here did not rise to anywhere near that level; no one claimed that either the father or the child was a *member* of Pocahontas's tribe (whatever tribe that may be). Hence, CFS was not required to give notice to the Pamunkey Tribe.[8]

The father also faults the March notice because it said that he had no Indian ancestry. When it was sent, however, neither he nor Margaret had yet claimed any Indian ancestry. The March notice could not possibly have been misleading, because it was sent only to Cherokee, Blackfeet, and Sioux-related tribes, in which the mother asserted ancestry, and not to any tribe in which the father asserted ancestry. Even if the notice had recited that the father was related to Pocahontas, none of the tribes that received the March notice would have claimed him. Thus, the failure to disclose the father's Indian ancestry in the March notice was harmless.

---

[8] The father also contends that CFS failed to give notice to other tribes that are also descended from Pocahontas's tribe. We reject this contention for the same reason and also for the reasons already stated in part III.B, *ante*.

14

IV

DISPOSITION

The order appealed from is conditionally reversed. On remand, the juvenile court must direct CFS to ask Wesley about the possibility that the child might have Indian ancestry. If it is not reasonably feasible to contact him, or if based on his response, there is no reason to believe that the children are Indian children, the juvenile court must reinstate the order terminating parental rights. Otherwise, it must proceed in accordance with the further inquiry requirements and, if appropriate, the notice requirements of ICWA and related federal and state law; then it must determine whether ICWA applies. If it determines that ICWA does not apply, it must reinstate the order terminating parental rights. If it determines that ICWA does apply, it must proceed accordingly.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

FIELDS
J.

15